## CHOURNOS v. EVONA INV. CO. et al.

No. 6092. Decided August 10, 1939. (93 P. 2d 450.)

Rehearing denied October 17, 1939.

336

For opinion on rehearing, see 97 Utah 346, 94 P. 2d 470.

*Thatcher & Young*, of Ogden, for appellant.

*Cheney, Jensen, Marr & Wilkins*, of Salt Lake City, and *Arthur Woolley* and *DeVine, Howell & Stine*, all of Ogden, for respondents.

PRATT, Justice.

Nick Chournos and L. L. Keller were joint lessees of certain grazing land. The Evona Investment Company was the lessor. The lease was to expire October 1, 1939. It was in writing and contained the following provision:

"8. The lessor reserves, and is hereby given, the right to sell the lands herein described at any time during the continuance of this lease, or any extension thereof, but with the provision that the lessees shall have, and they are hereby given the first opportunity of purchasing the said premises, upon the same price and terms the lessor would receive of other parties   *   *   *."

On December 23, 1936, the Company served upon Chournos a notice that one Lloyd Keller (a son of L. L. Keller) had offered $6,100 for the land. The notice was addressed to both Nick Chournos and L. L. Keller. It contained the following paragraph:

"And you are hereby further notified that said Evona Investment Company intends to, and will, sell and convey the said lands, and all thereof, to said Lloyd W. Keller for said price on or before the said date, unless you shall pay to the said Evona Investment Company the same or a greater sum on or before 12:00 o'clock noon of said January 2nd, 1937, for said premises."

At approximately 11:45 a. m., January 2, 1937, Chournos and his counsel appeared at the Company office, tendered

Mr. Cook, the Company agent, $6,100 and requested a deed to Chournos. Admittedly they did not desire a deed to Chournos and Keller jointly. Mr. Cook refused the tender and request for deed, stating that he had received, that morning, a similar tender and request from L. L. Keller and his counsel; that he could not sell to both. Then Chournos and his counsel tendered one-half the amount for a deed for an undivided one-half of the land. Cook refused this. As the conversation proceeded, 12 o'clock rolled by. Suddenly Cook said all tenders were off as it was one minute past 12 o'clock. That afternoon a deed was issued and delivered to Lloyd Keller and Chournos commenced this suit by serving summons.

Plaintiff sought to compel the Company and the Kellers to specifically perform the terms of the option. He claimed a conspiracy upon the part of the defendants to deprive him of his interest in the leased land. Among other things, the lower court found that the Kellers had schemed together to get the land for Lloyd Keller; that the Company was not a party to that scheming; but that Chournos had not made a proper tender under the terms of the option. Judgment was rendered against Chournos and he has appealed.

There exists considerable bitterness between Chournos and Keller. Other actions have been filed between them. One came to this court on appeal. *Keller* v. *Chournos*, 95 Utah 25, 76 P. 2d 626. In that case, the lower court held that the two were joint adventurers in the sheep which were grazed upon the land involved in this suit. The decision by the Supreme Court, dismissing the case on procedural grounds, was rendered on the 28th day of February, 1938. Another suit was filed wherein Chournos sought a partition of these leased lands, and an accounting for rents for the use thereof by Keller, for the time he had all the sheep, awaiting the outcome of the appealed case cited above.

We find little difficulty in believing that the tender of L. L. Keller was conditioned upon a delivery of a deed to

himself. The father was very desirous of Lloyd having title to the property. Whether for the son's benefit or ultimately for his own is immaterial. It would not be a stretch of the imagination to believe that L. L. Keller knew ahead of time the attitude Cook, the agent of the Company, would adopt, if one of the lessees made a demand adverse to the interests of the other. Chournos had visited Cook on other occasions to ascertain if the agent would make a deed to him (Chournos). Cook and L. L. Keller had visited an attorney for advice as to whether or not Lloyd Keller could be a purchaser. Cook obtained advice on the matter from the Company counsel. What then would be more natural than that these matters were all discussed by the Kellers and Cook. The father (Keller) would not have to be very astute to see a means whereby he might interfere with Chournos, should the latter appear at the last moment, as he did, and tender the purchase price for a deed to himself as distinguished from a joint deed. Whether these inferences are justifiable or not, at least there is no evidence that L. L. Keller made a demand different from that testified to by Cook—conditioned upon a delivery of a deed to L. L. Keller.

Admittedly, Chournos did not want a deed to himself and L. L. Keller. When he tendered his $6,100 he was particular to request the deed to himself. When this was refused, he then tendered one-half of the amount for a one-half interest. One may safely say that the Company was not under any obligation to make a conveyance of fractional interests in the property. Thus we are brought to the question: Was the tender of either L. L. Keller or Nick Chournos a sufficient compliance with the option to bind the Company to execute a deed to them jointly? If either was, then plaintiff in this case is entitled to the relief he seeks, as Lloyd Keller is not, under the evidence, an innocent purchaser. There is no question but that the son knew about the circumstances as well as the father, and there is some question of whether he purchased solely with his own money, and not partly with his father's.

By the lease, the Company bound itself to extend an opportunity of purchase to the lessees, when and if the Company received an acceptable offer for the property. (See first quotation above.) However, that provision in the lease, standing alone, and without action by the Company, did not constitute an option in favor of the lessees.

"An option to purchase may be defined as a contract by which an owner agrees with another person that he shall have the privilege of buying his property at a fixed price within a specified time. The landowner does not sell his land; he does not then agree to sell it; but he does then sell something,—viz., the right or privilege to buy at the election, or option, of the other party. The second party gets in praesenti, not lands, or an agreement that he shall have lands, but he does get something of value; that is, the right to call for and receive lands if he elects. * * *" 27 R. C. L. 334.

But when the Company sent out the notice pursuant to that provision, the two (the provision and the notice) became an option, to be accepted, if accepted, by a certain definite time, in a certain definite amount, and in accordance with the intent of the terms of the agreement. If not so accepted, then the Company was no longer concerned with the lessees as such, and might convey as it wished.

"According to the great weight of authority, a court of Equity will decree specific performance in favor of the holder of an option who has duly elected to exercise his right to purchase. The principle on which this seeming exception to the general requirement of mutuality in contracts is based, is that the vendor's agreement to convey at the option of the purchaser is a continuing offer until accepted within the time and on the terms limited in the option, and when accepted it becomes a valid agreement, supported by mutual promises." 27 R. C. L. 337.

"To constitute a valid exercise of an option and impose a duty on the vendor to convey, the terms and conditions of the option must be complied with by the purchaser. If he attaches to his acceptance conditions, not warranted by the terms of the option, or notice of his election to buy, this itself amounts to a rejection; but it is otherwise where the acceptance is in the first instance unconditional, and a mere request is added for a departure from the terms

of the option as to the time and place of completing the transaction."
27 R. C. L. 342.

We are of the opinion that neither Keller nor Chournos, by his tender, accepted the Company's offer. The condition of making the deed to the individual rather than to the two jointly was, to say the least, a material change in the intent of the lease. It meant to the Company a possible damage action for failure to carry out the terms of the option. That either lessee might have an adequate remedy against the other, under such circumstances, does not mean that the Company under its lease and option should assume the burden of relying upon that remedy for its own protection. It appears quite clearly to have been the intent of the parties, when they made the lease, that the lessees' acceptance of the option called for a deed to both of them jointly.

As neither lessee made a proper acceptance of the offer, the Company could convey as it saw fit. What then if it conveys, say indirectly to the other lessee, assuming the son is a mere figurehead of the father in the transaction? Undoubtedly the Company is out of the picture. The option having fallen through, it is no longer concerned. What about the two lessees?

Generally, as between tenants in common and joint tenants, a confidential relationship exists that prohibits one taking advantage of the other by buying the title to the property. Had Chournos accepted the Company offer as it was intended, there is no question but that he could compel Keller to share with him, if the latter got the deed. But Chournos did not accept that offer. Instead he made a counter offer which was not accepted by the Company. In effect he repudiated any desire for a joint ownership with Keller in the property, until he discovered that Keller was ahead of him with such ideas. If then, Keller was scheming to get the property in his own name and away, from Chournos, the latter very effectively aided him

by failing to accept the terms of the Company option within time, and thereby compelling the Company to deliver a proper deed. Nor was Chournos entirely innocent in the matter. Apparently he adopted the theory of his tender in the hope that he would get the deed in his own name. Probably in the thoughts of both Keller and Chournos there was some advantage in having a deed to the individual. Having assumed the risk of failing upon his counter offer, we can see no reason for reinstating Chournos under the terms of the option—terms that he practically repudiated by his counter offer. He does not claim, either by pleadings or evidence, that he did not want to buy the property at the time, but was forced by the scheming of Kellers to make the tender for his own protection.

We have covered the main assignments of error in the case. One or two others should be mentioned. Appellant objects in one assignment to the lower court's holding that Chournos and his counsel had gone to the agent for the purpose of tendering the money for a deed to Chournos only; that such a deed was merely requested after a proper tender was made. We cannot agree with this. If it were so, then why did not Chournos and his counsel correct the erroneous impression that Cook seems to have gotten from their request? When Cook remarked that he could not deliver to Chournos because Keller had also made such a demand, they did not explain that what they meant was merely a delivery of the deed to Chournos, that the deed could be made in the name of the lessees jointly. Cook had every reason to believe otherwise, as Chournos had visited him before upon such subject matter.

As the lower court held that the Kellers had schemed to deprive Chournos of the property, the failure of the court to admit evidence of the peculiar value of that land for grazing purposes in order to show a motive for the scheming, if error, was not prejudicial. Nor was it prejudicial to find that notice of intent to sell had been served upon L. L. Keller as well as Chournos. Keller

knew what was going on and made his tender in time. Actual formal service of notice was immaterial as to him.

The decision of the lower court is affirmed. Costs to respondent.

MOFFAT, C. J., and LARSON, J., concur.

WOLFE, Justice.

I dissent. In this case there was connivance by L. L. Keller for the purpose of ousting Chournos, joint holder of what the prevailing opinion holds was a contingent option, from exercising that option and for the purpose of getting the title solely in the name of his son and away from Chournos. The net final result seems to be that he succeeded. That does not seem to comport with the dictates of fairness.

The interest of Keller and Chournos in the property was a community interest, both as to the lease and as to the contingent option. Regardless of the personal feelings of the members of this community, neither could do anything adverse to the community interest for his own advantage. Any advantage which in the end either gained by such adverse conduct as against the other, equity would not permit him to retain. And even if both parties to the common interest were secretly or openly trying to put the other out of that interest by attempts to use the third party for that purpose, the one who succeeded would have no standing in equity as against the other; for the principle that equity would leave them where it finds them does not apply in such case. See note, 4 A. L. R. 58. But in this case the plaintiff may have made his offer because of his very suspicion—evidently well-founded—that L. L. Keller was acting through Lloyd Keller and to protect himself.

Granted the correctness of the holding that before the Company's notice of December 23, 1936, there was only a contingent option and that the option came into effect only by that notice, the fact remains that said option was stimulated by the scheme of L. L. Keller and had its initiation therein. If the company was an innocent party, the option

could be considered as having arisen as to it. But as between Keller and Chournos the notice of option cannot be considered as raising any duty on the part of Chournos to meet a figure which came about through the scheme of Keller to elbow Chournos out of his interest in the contingent option. Keller cannot in any case end up with an advantage over Chournos which has its roots in his own machinations. If Keller had himself offered $6100 and thus attempted to mature the inchoate option, Chournos would not be bound by any supposed efflux of time fixed in a notice from the Company stimulated by such offer. Or if Keller had by letter used a fictitious person to do so, the answer would be the same. Nor can he by stimulating a third person to make the offer for the purpose of ousting his other community member, or gaining an advantage, claim that the Company was free to sell to him because of a claimed expiration of time limit based on a notice which arose because of his tactics adverse to the common interest. Nor can Chournos be said to have treated the option and time limit contained therein as having been properly made because he too made a competitive bid. He was put in the position of having to do so by the acts of Keller initiated in subterfuge.

Whether or not the Company was innocent of the fact that L. L. Keller was acting through Lloyd Keller, it desired to sell the property for $6100 and did so. Both Chournos and the Kellers are before the court; the Company is out of it. All that remains is for equity to do justice between these two parties. And the simple and fair solution is to require Lloyd Keller to convey to L. L. Keller and Nick Chournos on the payment of $6100, to be contributed by them equally, the entire property, or if L. L. Keller desires to forego his half interest and leave it with his son, then an undivided one-half interest to Chournos on payment of $3050. The joint asset then becomes one to be liquidated as other partnership or joint venture assets. If it can be sold for more than $6100 each shares in the gain. For the above reasons I dissent.

McDONOUGH, Justice.

I dissent. The court found that the Kellers "worked and planned together to obtain a deed for Lloyd W. Keller, to said premises and said Kellers were jointly interested in the funds paid as consideration for said deed * * * that they planned and schemed together" to that end. Neither of the Kellers stand in a better position than would L. L. Keller had he purchased outright in his own name. The problem presented then is that of the cotenant of a lease-hold purchasing the outstanding title, with the additional fact that by such purchase and under the circumstances here he thereby cut off a contingent option to purchase given by the lease to the cotenants.

Joint tenants stand in a confidential relationship to each other as to the property which they hold or occupy, and where one of them acquires a superior claim to the land, adverse to the joint tenancy, he may be compelled to hold it for the joint tenancy. This general statement is so well established as to be beyond question. *Ruthrauff* v. *Silver King Western M. & M. Co.*, 95 Utah 279, 295, 296, 80 P. 2d 338; *Malone* v. *Young*, 148 Kan. 250, 81 P. 2d 23; *Sutton* v. *Sutton*, 211 N. C. 472, 190 S. E. 718; *Kievman* v. *Grevers*, 122 Conn. 406, 189 A. 609; *Stewart* v. *Shearman*, 22 Cal. App. 2d 198, 70 P. 2d 702; Thompson, Real Property, Secs. 1789, 1790; Freeman, Cotenancy and Partition, Sec. 156; *Hodgson* v. *Federal Oil & Development Co.*, 274 U. S. 15, 47 S. Ct. 502, 71 L. Ed. 901, 54 A. L. R. 874; *Gilb* v. *O'Neill*, 225 Ala. 92, 142 So. 397, 85 A. L. R. 1535; 62 C. J. 456-459, 461. This rule applies, to cotenancies of lease-hold where the interest acquired is hostile to the lease, but not otherwise. 54 A. L. R. 907, 908 and cases there cited.

Under its terms the lease would not expire until October 1, 1939. But upon sale of the land the term ran only until a year after the date of sale. Thus the purchase by the cotenant Keller—assuming the purchase to have been made by him—shortened the term by one year and nine months.

He acquired an interest hostile to the lease. In addition, the purchase by him cut off the contingent option to purchase vested in the cotenants. This result was effected by his scheming and conniving so to do. A cotenant who acquires such title to property jointly leased that the lease is interfered with may be compelled by the other cotenant, if offering to do equity, to hold the land for their mutual benefit. *Decorso* v. *Thomas,* 89 Utah 160, 50 P. 2d 951; *Ramberg* v. *Wahlstrom,* 140 Ill. 182, 29 N. E. 727, 33 Am. St. Rep. 227. The Decorso case is closely analogous to the case at bar, except that there the court found a partnership. That does not seem to make a material difference as to this question. According to the holding of that case the defendant Lloyd W. Keller should be declared to hold a half interest in the property in constructive trust for the plaintiff who offers to pay his proportionate cost of the property.

For the foregoing reasons and those assigned by Mr. Justice WOLFE in his dissenting opinion I am of the opinion that the judgment of the district court should be reversed.